| STATE OF INDIANA | ) | IN THE ALLEN CIRCUIT/SUPERIOR COURT |
| COUNTY OF ALLEN | ) SS: ) | CAUSE NO. |

| IUE-CWA LOCAL 901, on behalf of itself and on behalf all others similarly situated, | ) ) ) | |
| Plaintiff | ) ) | CLASS ACTION COMPLAINT AND JURY TRIAL DEMANDED |
| v. | ) ) ) | |
| SPARK ENERGY, LLC, | ) ) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff IUE-CWA Local 901 ("Plaintiff" or "the Union") brings this action against Spark Energy, LLC ("Defendant" or "Spark Energy"), by and through its attorneys, on behalf of itself and on behalf of all others similarly situated, and alleges as follows:

## NATURE OF THE ACTION

1.      This action seeks to redress Spark Energy's deceptive, bad faith, and unfair pricing practices that have caused businesses and consumers in Indiana to pay considerably more for their natural gas than they should otherwise have paid.

2.      Defendant engages in a classic bait-and-switch deceptive and unfair marketing scheme aimed at those hoping to save on the cost of natural gas.

3.      Spark Energy lures businesses and consumers into switching natural gas providers by offering an initial rate for a limited period of time that is competitive with local utility natural gas rates.  After that initial term, Spark Energy switches its customers to a variable rate based upon "market prices."  In reality, Spark Energy's variable rates are substantially higher than those otherwise available in the natural gas market, and its rates do not reflect changes in "market prices" for the natural gas it supplies to its retail customers.  As a result, unsuspecting

1

businesses and consumers are being fleeced millions of dollars in exorbitant charges for natural gas. Spark Energy's scheme is unfair, immoral, unethical, oppressive, and unscrupulous.

4.      This suit is brought pursuant to the Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5, *et seq.*, and the common law on behalf of a class of Spark Energy customers who were charged a variable rate for natural gas by Spark Energy from June 2017 to the present. This suit seeks, *inter alia*, injunctive relief, actual damages, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

5.      Plaintiff IUE-CWA Local 901 is a labor union located in Fort Wayne, Indiana. The Union was one of numerous Spark Energy customers for natural gas from approximately at least 2004 to approximately March 2019 (when the Union realized that it was being overcharged). As a result of Spark Energy's deceptive and unfair conduct, the Union incurred excessive charges for natural gas. Less than six months after the Union discovered that Spark Energy acted deceptively, the Union gave written notice, describing the nature of Spark Energy's deceptive acts and the actual damages the Union suffered as a result.

6.      Defendant Spark Energy, LLC is a limited liability company licensed to operate in Indiana. Spark Energy is an alternative retail energy supplier, providing energy services to commercial and residential customers in the State. Spark Energy has thousands of customers, and tens of millions of dollars in revenues.

## JURISDICTION AND VENUE

7.      Defendant has submitted to the jurisdiction of the courts of this State as to the instant action because it arises from Spark Energy doing business in this State and having

supplied or contracted to supply services rendered or to be rendered or goods or materials furnished or to be furnished in this State pursuant to Trial Rule 4.4(A)(1) & (4).

8.      Preferred venue lies in Allen County under Trial Rule 75(A)(10) because Allen County is the county in which the Union maintains its principal office, and Spark Energy is a nonresident defendant without a principal office in the State.

## FACTUAL ALLEGATIONS

9.      In 1995, Indiana made the decision to deregulate the market for natural gas supply.  Among the goals of the reorganization were increased competition and deregulation within the industry, with an eye towards achieving greater consumer choice and an overall reduction of energy rates.  As a result, the State's natural gas industry is open to competition, and customers may choose their energy supplier.

10.     The new energy suppliers, who may compete against local utilities such as the Northern Indiana Public Service Company ("NIPSCO"), are known as alternative natural gas suppliers or "ANGS."  While ANGS supply the natural gas, local utilities continue to maintain and service the distribution system and deliver gas to customers.  The local utility also continues to bill the customer for both gas and delivery costs.  The only difference to the customer is whether the utility or an ANGS sets the price for the customer's energy supply.

11.     The public policy motivation for allowing customers a choice of energy suppliers is to enable retail customers to take advantage of increased competition between suppliers in the open market.  The fundamental purpose behind this policy is that competition would result in ANGS being more aggressive and creative than the utility in reducing wholesale purchasing costs, thereby lowering prices for retail customers.

12.    Customers who do not choose to switch to an ANGS for their energy supply continue to receive their supply from their local utility.

13.    NIPSCO adjusts its price every quarter based on market prices.  The Indiana Utility Commission ("IURC") oversees its rates.

14.    For investor-owned utilities ("IOUs") like NIPSCO, rates are determined using three basic elements: the rate base -- the amount of money the utility has invested in the facilities that serve customers, minus accumulated depreciation, but including capital, materials, and supplies required to keep the company operating; operating expenses -- the costs incurred in a specific period, including, among other things, wages and benefits for employees, customer services, and administration costs; and the allowed return -- the money required to pay interest on borrowed money plus the additional amount paid to shareholders for the use of their money, or what it costs the utility to obtain capital from lenders and shareholders.  Thus, Indiana rates do not include any profits, but instead serve as pure reflections of the market costs for natural gas and associated market costs.

15.    By contrast, ANGSs such as Spark Energy have various options to buy natural gas at wholesale for resale to its customers and, at the same time, make reasonable profits.  These options include owning natural gas production facilities; purchasing natural gas from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing natural gas in advance of the time it is used by customers, either by purchasing physical gas to be used in the future or by purchasing futures contracts for the delivery of natural gas in the future at a predetermined price.  The purpose of deregulation is to allow ANGSs to use these and other innovative purchasing strategies to reduce natural gas costs, and pass those savings on to customers.

16.    Therefore, ANGSs should be able to offer rates competitive with, or substantially lower than, utilities' rates, and in fact many do.  Indeed, Spark Energy offered fixed rates during the time the Union was a Spark Energy customer that were competitive with or lower than Indiana's utilities' rates.

17.    As part of the deregulation plan, ANGSs (like Spark Energy) do not have to file or seek approval for the natural gas rates they charge or the methods by which they set their rates with the IURC.[1]

18.    Spark Energy exploits deregulation and the lack of regulatory oversight in the energy market to deceptively charge customers exorbitant rates for natural gas.  In fact, Spark Energy's rates are untethered from changes in wholesale prices and substantially higher than its own fixed rates, rates charged by other ANGS, and rates charged by local utilities.

19.    Spark Energy lured customers into switching natural gas providers by offering an initial fixed rate for a limited period of time that is competitive with local utility natural gas supply rates.  Once that initial term expires, Spark Energy switches its customers to a variable rate based upon current "market prices."  In reality, Spark Energy's variable rates are substantially higher than those otherwise available in the natural gas market, and its rates do not reflect changes in market prices for the natural gas it supplies to its retail customers.  As a result, unsuspecting customers are being fleeced millions of dollars in exorbitant charges for natural gas.  Spark Energy's scheme is unfair, immoral, unethical, oppressive, and unscrupulous.

---

[1] *See NIPSCO Choice Program*, Indiana Utility Regulatory Commission, https://www.in.gov/ iurc/2391.htm (last visited July 19, 2019, 11:21 a.m.) ("The Choice program allows natural gas customers of Northern Indiana Public Service Company (NIPSCO) to choose an alternative natural gas supplier (*these suppliers are not regulated by the Commission*).)" (emphasis added)).

20.     As any reasonable customer would expect, there are only two aspects of "market prices" that affect Spark Energy's sales of natural gas to customers: supply side, as reflected in the state of wholesale market pricing (wholesale costs make up the vast majority of NIPSCO's costs to provide retail natural gas) and demand side, as reflected in the rates Spark Energy's competitors charge other retail customers.

21.     To obtain its business, Spark Energy offered to provide the Union with an initial rate for natural gas supply to be followed by a market-based variable rate after the expiration of any subsequent rate periods based on fixed terms.  Spark Energy's initial rate offer was competitive with NIPSCO's then-current rate.

22.     Spark Energy provided the Union with its standard customer agreement, which provided that, upon expiration of the initial rate, the Union would be automatically transferred to Spark Energy's variable rate plan, "which would be based on market prices."  Any reasonable customer would understand based on these representations that Spark Energy's variable rate would be competitive and only vary from the initial fixed rate according to changes in "market prices."  Any reasonable customer would understand that the primary, if not sole, components of "market prices" is wholesale prices and the retail prices of other competitors (namely the local utility and other ANGSs) charge.  The Union thus reasonably expected that Spark Energy's variable rates for natural gas would only vary from its initial rate based on "market prices." *i.e.*, the rates Spark Energy's competitors charge and wholesale costs for purchasing natural gas.

23.     The customer agreement also provided the Union with a recessionary period during which it could rescind the contract prior to its commencement should it not agree to its terms.  During that recessionary period, the contract served as a solicitation in which Spark

Energy identified the basis upon which the promised market-based variable rate would be determined.

24.     In April 2006, the Union's account switched to Spark Energy's month to month, market based variable rate.

25.     But in violation of its promises and its customers' reasonable expectations, Spark Energy's variable rate does not reflect changes in wholesale natural gas prices and, it is invariably substantially higher than competitors' rates.

26.     The following table identifies the last 23 billing periods (beginning in May 2017) during which the Union was enrolled in Spark Energy's natural gas services, the variable rate Spark Energy charged the Union, the corresponding rate NIPSCO would have charged (which, as discussed above, is a reasonable representation of a rate based on wholesale market prices), and the differences between Spark Energy's and NIPSCO's contemporaneous rates:

| Billing Period | Spark Energy Rate Per Therm[2] | NIPSCO Rate Per Therm[3] | Difference Per Therm[4] | Percent Difference |
|---|---|---|---|---|
| 4/25/17 – 5/23/17 | $1.6298 | $0.2527 | $1.3771 | 544.97% |
| 5/23/17 – 6/23/17 | $1.8343 | $0.2002 | $1.6341 | 816.25% |
| 6/23/17 – 7/25/17 | $1.6773 | $0.1730 | $1.5043 | 869.53% |
| 7/25/17 – 8/24/17 | $1.6919 | $0.1649 | $1.5270 | 926.00% |
| 8/24/17 – 9/25/17 | $1.7064 | $0.1891 | $1.5173 | 802.37% |
| 9/25/17 –10/24/17 | $1.7242 | $0.2503 | $1.4739 | 588.84% |
| 10/24/17 – 11/22/17 | $1.4063 | $0.2790 | $1.1273 | 404.03% |
| 11/22/17 – 12/21/17 | $1.3998 | $0.3207 | $1.0791 | 336.49% |
| 12/21/17 –– 1/24/18 | $1.3950 | $0.3082 | $1.0868 | 352.63% |
| 1/24/18 – 2/23/18 | $1.3982 | $0.3296 | $1.0686 | 324.21% |
| 2/23/18 – 3/23/18 | $1.4011 | $0.3134 | $1.0877 | 347.08% |
| 3/23/18 – 4/24/18 | $1.4035 | $0.2338 | $1.1697 | 500.30% |
| 4/24/18 – 5/23/18 | $1.6289 | $0.2019 | $1.4270 | 706.79% |
| 5/23/18 – 6/25/18 | $1.6498 | $0.1749 | $1.4749 | 843.27% |
| 6/25/18 – 7/25/18 | $1.8241 | $0.1623 | $1.6618 | 1023.90% |
| 7/25/18 – 8/24/18 | $1.6733 | $0.1491 | $1.5242 | 1022.29% |
| 8/24/18 – 9/24/18 | $1.8311 | $0.1921 | $1.6390 | 853.21% |
| 9/24/18 – 10/24/18 | $1.4728 | $0.2369 | $1.2359 | 521.71% |
| 10/24/18 – 11/26/18 | $1.3991 | $0.2964 | $1.1027 | 372.03% |
| 11/26/18 – 12/26/18 | $1.3979 | $0.3357 | $1.0622 | 316.42% |
| 12/26/18 – 1/29/29 | $1.3970 | $0.3458 | $1.0512 | 303.99% |
| 1/29/19 – 2/25/19 | $1.3958 | $0.3202 | $1.0756 | 335.92% |
| 2/25/19 – 3/25/19 | $1.3993 | $0.3013 | $1.0980 | 364.41% |

27.     As explained above, NIPSCO is Spark Energy's primary competitor in the

Union's service territory, and NIPSCO's rates encompass the average wholesale price of natural

gas over time and associated costs without any markup, making it an ideal comparator.

28.    That Spark Energy's variable rate is not in fact a competitive market rate is demonstrated by the fact that Spark Energy's rate was consistently significantly higher than NIPSCO's rates. Between May 2017 and March 2019, Spark Energy's rate was higher than NIPSCO's rate *every single month*. On average, during this period, Spark Energy's rates were 585.9% higher than NIPSCO's rates. Spark Energy's rate was *more than three times* NIPSCO's rate during each of these 23 months; *more than four times* NIPSCO'S rate during 15 of these months; *more than five* times NIPSCO'S rate during eight of these months, and, twice, more than *ten times* NIPSCO'S rate.

29.    Spark Energy's failure to base its variable rate on "market prices" is likewise evidenced by the variable rate's failure to fluctuate in accordance with changes in NIPSCO's (*i.e.*, its primary competitor's) rate. For example, from May to June 2017, Spark Energy's rate per therm rose 12% -- from $1.629 to $1.8343. At the same time, NIPSCO's rate declined a remarkable 21% -- from $0.2527 to $0.2002. Similarly, from August to September of 2017, Spark Energy's rates per therm rose from $1.6919 to $1.7064, whereas NIPSCO's rates fell from $0.1730 to $0.1649.

30.    These same discrepancies occurred between February 2018 and July 2018, further evidencing that Spark Energy's rates did not track the market. In February of 2018, NIPSCO's rate per therm was $0.3296. It then decreased for each of the following five months, down to $0.1623. In sharp contrast, during that same period, Spark Energy's rates per therm increased

---

[2] Quantities of natural gas are measured in terms of volume via the unit "therm."

[3] NIPSCO's natural gas supply rates apply uniformly to both residential and commercial customers.

[4] On April 17, 2019, counsel for the Union spoke with a customer service agent for NIPSCO. She confirmed that historical natural gas supply rates are accurate. When asked, she also explained that she was not surprised that Spark Energy's rates were so exorbitant.

steadily for five months, from $1.3982 to $1.8241.  In fact, between February and July 2018, NIPSCO's rates experienced a substantial decrease of 68.02%, whereas Spark Energy's rate increased 30.4%.

31.     A reasonable customer would understand that a price based on market prices would be competitive with the price charged by Spark Energy's competitors' rates, namely its primary competitor NIPSCO.  But, as explained above, Spark Energy's variable rate was never competitive with NIPSCO's rate.  Thus, Spark Energy's rates are not in fact based on "market prices" or competing prices otherwise available in the market.

32.     Moreover, Spark Energy has a tactical advantage over the utility as it can purchase natural gas from any number of markets using any number of purchasing and hedging strategies, and therefore its cost for purchasing natural gas should at the very least reflect -- if not undercut -- utility prices.

33.     Instead, Spark Energy's rates are unfathomably and consistently higher than the local utility's rates.

34.     A reasonable customer would also understand and expect that "market prices" for retail natural gas would include the wholesale price for natural gas, that is, the market price available to Spark Energy for the natural gas it in turn supplies to its retail customers.

35.     However, Spark Energy's variable rate never varies with wholesale market prices.

36.     The following table identifies the most recent 23 billing periods during which the Union was enrolled in Spark Energy's variable rate, Spark Energy's variable rates for that period, the official Citygate rate, and the differences between Spark Energy's rates and contemporaneous Citygate rates.  The Citygate rate is the price payed by a natural gas utility when it receives natural gas transmission from a pipeline and reflects the official cost of

wholesale natural gas delivered to Indiana.  The Citygate rate is the benchmark, and Spark

Energy was and is capable of purchasing natural gas at these wholesale prices.

| Billing Period | Spark Energy Rate Per therm | Indiana Citygate Natural Gas Price | Difference Per therm | Percent Difference |
|---|---|---|---|---|
| 4/25/17 – 5/23/17 | $1.6298 | $0.4280 | $1.2018 | 281% |
| 5/23/17 – 6/23/17 | $1.8343 | $0.4870 | $1.3473 | 277% |
| 6/23/17 – 7/25/17 | $1.6773 | $0.4970 | $1.1803 | 237% |
| 7/25/17 – 8/24/17 | $1.6919 | $0.4740 | $1.2179 | 257% |
| 8/24/17 – 9/25/17 | $1.7064 | $0.4340 | $1.2724 | 293% |
| 9/25/17 –10/24/17 | $1.7242 | $0.3680 | $1.3562 | 369% |
| 10/24/17 – 11/22/17 | $1.4063 | $0.3710 | $1.0353 | 279% |
| 11/22/17 – 12/21/17 | $1.3998 | $0.3550 | $1.0448 | 294% |
| 12/21/17 -– 1/24/18 | $1.3950 | $0.3970 | $0.9980 | 251% |
| 1/24/18 – 2/23/18 | $1.3982 | $0.3790 | $1.0192 | 269% |
| 2/23/18 – 3/23/18 | $1.4011 | $0.3610 | $1.0401 | 288% |
| 3/23/18 – 4/24/18 | $1.4035 | $0.3250 | $1.0785 | 332% |
| 4/24/18 – 5/23/18 | $1.6289 | $0.4350 | $1.1939 | 274% |
| 5/23/18 – 6/25/18 | $1.6498 | $0.4570 | $1.1928 | 261% |
| 6/25/18 – 7/25/18 | $1.8241 | $0.4670 | $1.3571 | 291% |
| 7/25/18 – 8/24/18 | $1.6733 | $0.4830 | $1.1903 | 246% |
| 8/24/18 – 9/24/18 | $1.8311 | $0.4210 | $1.4101 | 335% |
| 9/24/18 – 10/24/18 | $1.4728 | $0.3830 | $1.0898 | 285% |
| 10/24/18 – 11/26/18 | $1.3991 | $0.3960 | $1.0031 | 253% |
| 11/26/18 – 12/26/18 | $1.3979 | $0.3980 | $0.9999 | 251% |
| 12/26/18 – 1/29/19 | $1.3970 | $0.3690 | $1.0280 | 279% |
| 1/29/19 – 2/25/19 | $1.3958 | n/a | n/a | n/a |
| 2/25/19 – 3/25/19 | $1.3993 | n/a | n/a | n/a |

37.    The disconnect between changes in wholesale prices and Spark Energy's variable rate demonstrates that Spark Energy's rates do not reflect changes in "market prices."  For several months at a time, the wholesale and Spark Energy rates for natural gas fluctuated in opposite directions.

38.    For example, from July to October 2017, the wholesale rate per therm declined without interruption.  During that same period, Spark Energy's rate per therm inexplicably rose each month.  From July to October 2017, the wholesale rate per them fell from $0.4970 to $0.3680, a 26% reduction, even though Spark Energy's rate steadily rose from $ 1.6773 to $1.7242, a 3% increase.

39.    Again, from January to April 2018, the wholesale rate declined for four straight months, while Spark Energy's rates rose each month.  From January to April 2018, the wholesale rate per therm fell from $0.3970 to $0.3250, while Spark Energy's rate rose from $1.3950 to $1.4035.

40.    Similarly, from August to September 2018, Spark Energy's rate rose from $1.6733 to $1.8311, a 41% increase, while the wholesale rate per them declined from $0.4830 to $0.4210, a 13% reduction.

41.    No reasonable customer who is told that their variable rate may vary according to market prices would expect that Spark Energy's rate would consistently remain constant or increase despite decreases in the wholesale price of natural gas.

42.    Spark Energy is aware that its variable rate does not fluctuate in accordance with market prices, and it makes no efforts to ensure that its rates are competitive, in spite of its representations to its customers and its customers' reasonable expectations.

43.     No reasonable customer, including the Union, would interpret "market prices" to mean that Spark Energy can exercise unfettered discretion to artificially inflate its rates -- so much so that the rates bear no resemblance to wholesale costs and competitors' rates -- in order to maximize profits at the expense of its customers.

44.     Spark Energy's statements regarding its natural gas rates are materially misleading, as the most important consideration for any reasonable customer when choosing an energy supplier is price.  No reasonable customer who knows the truth about Spark Energy's exorbitant rates would choose Spark Energy as a natural gas supplier.  All that Spark Energy offers customers is natural gas delivered by local utilities, a commodity that has the exact same qualities as natural gas supplied by other ANGSs or local utilities.  Other than potential price savings, there is nothing to differentiate Spark Energy from other ANGSs or local utilities, and the potential for price savings is the only reason any reasonable customer would enter into a contract for natural gas supply with Spark Energy.

45.     Spark Energy knows full well that it charges variable rates that are unconscionably high, and the misrepresentations it makes with regard to the rates being based on "market prices" were made for the sole purpose of inducing customers to purchase natural gas from Spark Energy so that it can reap outrageous profits to the direct detriment of customers without regard to the consequences high utility bills cause such customers.  Therefore, Spark Energy's actions were actuated by actual malice or accompanied by wanton and willful disregard for the well-being of customers.

46.     The Union asked Spark Energy to rectify its pricing and overcharges in March of 2019, but Spark Energy did not do so.

## CLASS ACTION ALLEGATIONS

47.    Plaintiff brings this action on behalf of itself and as a class action on behalf of the

following proposed class ("the Class"):

> All individual and business customers in Indiana who were charged
> a variable rate for natural gas services by Spark Energy from 2009
> to the present (the "Class)

48.    Excluded from the Class are the officers, directors and legal representatives of

Spark Energy and the judges and court personnel in this case and any members of their

immediate families.

49.    This action is properly maintainable as a class action under Indiana Rules of Trial

Procedure 23(A) and (B)(3).

50.    Numerosity.  The members of the Class are so numerous that joinder of all

members is impractical.  While the number of Class members is unknown to Plaintiff at this

time, based on information and belief, it is estimated to include thousands of individuals.  The

exact number is generally ascertainable by appropriate discovery, as Spark Energy has

knowledge of the customers who were charged variable rates.

51.    Commonality.  There are questions of law and fact common to the Class, which

predominate over any questions affecting only individual Class members.  These common

questions of law and fact include, without limitation:

- whether Defendant violated Ind. Code Ann. § 24-5-0.5 *et seq*.;

- whether Defendant breached its contracts with customers by charging variable

  rates not based on "market prices";

- whether Defendant breached the covenant of good faith and fair dealing by

  exercising its unilateral price-setting discretion in bad faith, i.e., to price gouge or

upset the reasonable expectation of customers that Spark Energy variable rates would be competitive and reflect changes in the wholesale price of natural gas;

- whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

- whether Defendant should be enjoined from continuing to charge exorbitant rates based on factors other than "market prices."

52.    Typicality. Plaintiff's claims are typical of those of other Class members because Plaintiff's energy rates, like that of every other Class member, did not follow market trends and were not based on market conditions, as alleged in their contracts with Spark Energy.  Further, Plaintiff, like all Class members, was injured by the exorbitant, unfairly priced energy rates. Plaintiff is advancing the same claims and legal theories on behalf of itself and all other Class members, and there are no defenses that are unique to Plaintiff.  The claims of Plaintiff and those of other Class members arise from the same operative facts and are based on the same legal theories.

53.    Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Class in that it has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and violations of law Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiff has retained counsel experienced in complex consumer class action litigation, including class litigation involving customer protection and independent energy companies, and Plaintiff intends to prosecute this action vigorously.

54.     Superiority of Class Action. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.  In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

55.     The litigation of the claims brought herein is manageable.  Spark Energy's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

56.     Adequate notice can be given to Class members directly using information maintained in Spark Energy's records.

57.     Predominance. Pursuant to Rule 23(B)(3), the issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to, the questions identified in Paragraph 43 above.

58.     It does not appear that other persons who fall within the Class definition set forth above are pursuing similar litigation.

59.     This proposed class action does not present any unique management difficulties.

## FIRST CAUSE OF ACTION
### Violation of Ind. Code Ann. § 24-5-0.5, *et seq.*

60.     Defendant's violations of Ind. 24-5-0.5, *et seq.* and the common law are

applicable to all Class Members, respectively, and Plaintiff is entitled to have Defendant

enjoined from engaging in illegal and deceptive conduct in the future.

61.     Plaintiff repeats and re-alleges the allegations contained in the preceding

paragraphs 1 through 51 as is fully set forth herein.

62.     The Indiana Deceptive Consumer Sales Act prohibits a "supplier" from

committing:

> An unfair, abusive, or deceptive act, omission, or practice in connection with a
> consumer transaction.   Such an act, omission, or practice by a supplier is a
> violation of this chapter whether it occurs before, during, or after the transaction.
> An act, omission, or practice prohibited by this section includes both implicit and
> explicit misrepresentations.

Ind. Code Ann. § 24-5-0.5-3.  The statute defines '"Person'" as "an individual, corporation, the

state of Indiana or its subdivisions or agencies, business trust, estate, trust, partnership,

association, nonprofit corporation or organization, or cooperative or any other legal entity."  Ind.

Code Ann. § 24-5-0.5-2.

63.     The DCSA provides for two types of actionable deceptive acts.  The first is an

"uncured" deceptive act. I.C. 24-5-0.5-2(a)(7), which applies when a customer who has been

damaged gives notice to the supplier and the supplier either fails to offer to cure the deceptive act

within thirty days or "the act has not been cured as to such customer within a reasonable time

after the customer's acceptance of the offer to cure."  Ind. Code Ann. §§ 24-5-0.5-2(7)(A)-(B).

The cure must be "reasonably calculated to remedy a loss claimed by the consumer."  24-5-0.5-

2(6)(A).

64.     An incurable deceptive act means "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead."  Ind. Code Ann. § 24-5-0.5-2(8).

65.     Defendant's unfair, false, deceptive, and misleading statements and omissions with respect to the rates charged for natural gas, as described above, constitute an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction and thus violates the DCSA.

66.     When Plaintiff became aware of the exorbitant prices that it was paying for natural gas, Plaintiff notified Defendant -- in writing -- of its dissatisfaction and requested that Defendant restore Plaintiff to an earlier rate.  Defendant refused to do so.  Over thirty days have passed since that request, and Defendant has made no offer to cure the deceptive act.

67.     Defendant's unfair, false, deceptive, and misleading statements and omissions were never cured, even though Plaintiff notified it of the unfair pricing increases.

68.     Defendants unfair, false, deceptive, and misleading statements were connected to a scheme, artifice, or device with intent to defraud or mislead.

69.     Defendant also failed to inform customers that its rates are substantially higher than those based on "market prices."  Defendant further failed to disclose that its variable rates were artificially inflated to maximize profits at the expense of its customers.  That information would have been material to any customer deciding whether to purchase natural gas from Defendant.

70.     Defendant made these unfair, false, deceptive, and misleading statements and omissions with the intent that customers rely upon such statements.

71.     Defendant's price gouging scheme, which often affects Indiana's most vulnerable citizens, is unfair, immoral, unethical, oppressive, and unscrupulous.  Victims of Spark Energy's

scheme cannot avoid it; once Spark Energy has charged its exorbitant rate, customers can only

pay the amount charged or risk having their natural gas shut off.  In Indiana, this can be a life-

threatening issue in the depths of the summer and winter.  Moreover, Spark Energy's customers

are not informed that Spark Energy is price gouging them, and reasonable customers paying a

market-based variable rate reasonably trust that the ANGS providing them service will not

charge a rate divorced from "market prices" about which they are not, as private individuals,

ordinarily privy.  That Spark Energy's rates are higher than rates charged by 9 out of 10 other

ANGS proves how its roguish behavior is outside of the commercial norm.

72.    Defendant's price gouging scheme offends public policy as well.  The purpose of

deregulation is to allow ANGS like Spark Energy to offer competitive rates to the benefit of

customers.  Spark Energy offers nothing of value to customers; instead, it callously takes

advantage of deregulation, and the difficulty customers face in determining when "market

prices" change such that a market variable rate should be higher or lower, to charge outrageously

high rates, secure in the knowledge that the public utility commission has no authority to curb its

behavior.

73.    Spark Energy's price gouging behavior causes customers significant and

substantial pecuniary injury.

74.    Plaintiff and other Class Members entered into agreements to purchase natural gas

from Defendant and suffered ascertainable loss as a direct and proximate result of Defendant's

actions in violation of the Deceptive Consumer Sales Act.

75.    As a consequence of Defendant's wrongful actions, Plaintiff and the other Class

Members suffered an ascertainable monetary loss based on the difference in the rate they were

charged versus the rate they would have been charged had Defendant charged a competitive rate

based on "market prices" or had they not switched to Defendant from their previous supplier, as well as any monthly fees assessed by Defendant.

76.     Plaintiff and other Class Members suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase natural gas from Defendant if the true facts concerning its rates and fees had been known.

77.     Plaintiffs also suffered an ascertainable loss because they paid a higher price for gas service than they would have been charged had Spark Energy not acted deceptively and unfairly.

78.     By reason of the foregoing, Defendant is liable to Plaintiff and other Class Members for trebled compensatory damages; punitive damages; attorneys' fees; and the costs of this suit.

79.     Defendant knows full well that it charges variable rates that are unconscionably high, and the misrepresentations it makes with regard to the rates being based on "market prices" were made for the sole purpose of inducing consumers to purchase natural gas from it so it can reap outrageous profits to the direct detriment of Indiana consumers and without regard to the consequences high utility bills cause such consumers.  Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiff and the other Class Members. Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
**Breach of Contract & Breach of the Implied Covenant of Good Faith and Fair Dealing**

80.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 75 as is fully set forth herein.

81.     Plaintiff and the Class entered into valid contracts with Defendant for the provision of natural gas supply.

82.     Pursuant to that contract, Defendant agreed to charge a variable rate for natural gas that would be based on "market prices."

83.     Pursuant to the contract, Plaintiff and the Class agreed to pay Defendant's rate, and they did so.

84.     However, Defendant failed to perform its obligations under the contract because it charged a variable rate not based on "market prices," including the wholesale price of energy.

85.     Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for natural gas that was higher than it would have been had Defendant based the rate on "market prices."

86.     By reason of the foregoing, Defendant is liable to Plaintiff and the rest of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

87.     Additionally, every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

88.     Plaintiff reasonably expected that Defendant would attempt to make a reasonable profit in setting its rates and selling natural gas to consumers.  Nonetheless, Plaintiff reasonably expected that the variable rates for natural gas would, notwithstanding Defendant's profit goals,

21

reflect market prices, including competing rates and the wholesale price of natural gas, and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy natural gas from Defendant.

89.     Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiff's and other Class Members' reasonable expectations that the variable rate for natural gas would reflect "market prices," including competing rates and wholesale natural gas prices.  Defendant possesses the discretion to utilize a wide array of tools to offer competitive prices; instead, it arbitrarily does so in a way that materially disadvantages Plaintiff and the Class.

90.     Spark Energy required customers to sign a contract of adhesion -- a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.

91.     As a result of Defendant's breach, Defendant is liable to Plaintiff and other Class Members for actual damages in an amount to be determined at trial and attorney's fees.

### THIRD CAUSE OF ACTION
### Unjust Enrichment

92.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 87 above as is fully set forth herein.

93.     This cause of action is pled in the alternative to Plaintiff's contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiff does not intend to proceed with its unjust enrichment claim.

94.     Plaintiff and the Class members conferred a tangible economic benefit upon Defendant by contracting with Defendant for natural gas.  Plaintiff and the Class Members

would not have contracted with Defendant for natural gas had they known that Defendant would charge rates substantially in excess of those charged by local utilities.

95.    By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties, at the expense of Plaintiff and the Class.

96.    It would be unjust and inequitable for Defendant to retain the excessive payments Plaintiff and the Class made for natural gas supply.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court should enter judgment against Defendant as follows:

- Ordering appropriate injunctive relief;

- Certifying this action as a class action, with a class as defined above;

- On Plaintiff's First Cause of Action, awarding actual damages, or statutory damages of $500, whichever is greater, and treble damages, against Defendant and granting appropriate injunctive relief;

- On Plaintiff's Second Cause of Action, awarding against Defendant damages that Plaintiff and other Class Members have suffered and granting appropriate injunctive relief;

- On Plaintiff's Third Cause of Action, awarding against Defendant damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions;

- Awarding Plaintiff and the Class punitive damages;

- An award of attorneys' fees and costs;

23

- An award of pre-judgment interest

-  An award of post-judgment interest as permitted by law; and

- Such other and further relief as this court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

97.     Pursuant to Trial Rule 38(B), Plaintiff hereby demands a trial by jury.

Dated: August 14, 2019                        Respectfully submitted,

 /s/ Lynn Toops
Lynn A. Toops
Richard E. Shevitz
Vess A. Miller
Lisa M. La Fornara
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Fax: (317) 636-2593
rshevitz@cohenandmalad.com
ltoops@cohenandmalad.com
vmiller@cohenandmalad.com
llafornara@cohenandmalad.com

D. Greg Blankinship*
W. Scott Terrell III*
FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP
445 Hamilton Avenue, Suite 605
White Plains, NY 10601
Telephone: (914) 908-6702
Fax: (845) 522-5561
gblankinship@fbfglaw.com
sterrell@fbfglaw.com
*To Seek Admission Pro Hac Vice

*Counsel for the Plaintiff and the Proposed Class*