# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| IUE-CWA LOCAL 901, on behalf of itself and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | CAUSE NO.: 1:19-CV-389-HAB |
| SPARK ENERGY, LLC, | |
| Defendant. | |

## OPINION AND ORDER

Plaintiff, IUE-CWA Local 901, on behalf of itself and all others similarly situated, brings claims against Defendant Spark Energy, LLC, for violations of Indiana's Deceptive Consumer Sales Act (IDCSA or the Act), breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. Plaintiff alleges that Defendant is an alternative natural gas supplier that "engaged in a classic bait-and-switch deceptive and unfair marketing scheme aimed at those hoping to save on the cost of natural gas" (Class Action Compl. ¶ 2, ECF No. 1), when it promised competitive variable rates based on market prices. In actuality, Defendant's prices were much higher than the rates otherwise available in the natural gas market.

This matter is before the Court upon Defendant's Motion to Dismiss [ECF No. 5] pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendant asserts that the applicable statute of limitations bar all claims, which they contend accrued fifteen years ago when Plaintiff began receiving natural gas from Defendant[1], or thirteen years ago when the fixed rate was converted to

---

[1] Defendant unhelpfully asserts that it has been misnamed, and that Spark Energy never sold natural gas to Plaintiff. In its submission related to removal of this action to federal court, Defendant advises that Spark Energy, LLC, is a limited liability company whose sole member is Spark Holdco, LLC. The members of Spark Holdco are Spark Energy, Inc. (a Delaware corporation with its principal place of business in Texas); Retailco, LLC; and NuDevco Retail, LLC.

a variable rate. As additional grounds for dismissal, Defendant argues that the Complaint allegations fail to set forth plausible claims for relief under the IDCSA, or for breach of contract, breach of the covenant of good faith and fair dealing, or unjust enrichment.

In response, Plaintiff argues that there is no statute of limitations bar because a separate actionable violation occurred each time Plaintiff paid the charged rate for natural gas that was not based on market prices. Plaintiff asserts that all the claims are supported by factual allegations that plausibly state its entitlement to relief

## STANDARD OF REVIEW

A pleading that states a claim for relief must set forth "a short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to relief," and "a demand for relief sought." Fed. R. Civ. P. 8(a). In considering motions to dismiss for failure to state a claim, "[courts] construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in her favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). "A plaintiff . . . must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Id.* at 1083 (quotation marks and citations omitted). Legal conclusions can provide a complaint's framework, but unless well-pleaded factual allegations move the claims from conceivable to plausible, they are insufficient to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

When the "allegations in the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations" it is not premature to dismiss a complaint that does not anticipate

an affirmative defense. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005); *see also Tregenza v. Great Am. Comm'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993) (noting that even though a plaintiff is not required to negate statute of limitations affirmative defense in his complaint, "if he pleads facts that show that his suit is time-barred or otherwise without merit, he has pleaded himself out of court").

When a party is alleging fraud, the heightened pleading standard of Rule 9(b) applies. The party must "state with particularity the circumstances constituting fraud." Fed. R. of Civ. P. 9(b). "While the precise level of particularity required under Rule 9(b) depends upon the facts of the case, the pleading 'ordinarily requires describing the who, what, when, where, and how of the fraud.'" *Camasta v. Jos. A. Banks Clothiers, Inc.*, 761 F.3d 732, 737 (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011)).

**COMPLAINT ALLEGATIONS**

Defendant is an "alternative natural gas supplier" or "ANGS." It sells natural gas to commercial and residential consumers. Plaintiff is a labor union located in Fort Wayne, Indiana, who was a customer of Defendant from 2004 through March 2019.

In 1995, Indiana deregulated the market for natural gas supply to increase competition, provide consumers with choices, and reduce energy rates. ANGS provide the same product to consumers as do utilities, such as NIPSCO, with the only difference being price. In fact, the local utilities continue to maintain and service the distribution system and deliver gas to customers.

The deregulation scheme was designed so that ANGS could compete with NIPSCO on price. While NIPSCO's rates remain subject to regulation by the Indiana Utility Commission, the rates are based on its actual costs and are adjusted every three months to compensate for those actual costs. Ind. Code § 8-1-2-42. NIPSO's rates serve as pure reflections of the market costs for

3

natural gas and associated market costs. ANGS are unregulated and have greater opportunity to be more aggressive and creative than NIPSCO in reducing their wholesale purchasing costs. Among other things, ANGS can own natural gas production facilities, take advantage of spot markets to purchase natural gas from wholesale marketers and brokers at the price available at or near the time of delivery, or they can purchase natural gas well in advance for future delivery, while being able to take greater advantage of futures markets to hedge against fluctuations in natural gas prices.

Other than potential price savings, there is nothing to differentiate Defendant from other ANGS or local utilities, and the potential for price savings is the only reason any reasonable customer would enter into a contract for natural gas supply with Defendant. In 2004, Plaintiff switched from NIPSCO to Defendant. Defendant provided Plaintiff with its standard customer agreement, which provided that for the first two years Plaintiff would pay a fixed rate. The fixed rate was competitive with NIPSCO's then-current rate. Plaintiff would thereafter be automatically transferred to Defendant's variable rate plan, "which would be based on market prices." (Compl. ¶ 22.)

Any reasonable customer would understand based on Defendants' representation about market prices that Defendant's variable rate would be competitive and only vary from the initial fixed rate according to changes in "market prices," which would include wholesale costs and the retail prices charged by other competitors, namely the local utility and other ANGS. Defendant's variable rates, to which Plaintiff transferred in 2006, were not based on these market prices. Available data from May 2017 to March 2019, shows that Defendants rates were, on average, 589.9% higher than NIPSCO's rates. Nor was there any correlation between Defendant's rates and the wholesale rates (the Citygate rate) for natural gas, or to fluctuations in the wholesale market. Often, when wholesale prices dropped, Defendant increased its rates.

No reasonable consumer would believe that rates based on "market prices" would have no correlation with wholesale markets. Moreover, Defendant's rates were higher than 90% of other natural gas retailers. Thus, Defendant statements regarding its natural gas rates are materially misleading. No reasonable customer who knows the truth about Defendant's rates would choose Defendant as its natural gas supplier. Further, Defendant knows that its variable rates are unconscionably high, and the misrepresentations it makes with regard to rates being based on "market prices" were made for the sole purpose of inducing customers to purchase natural gas from it despite the detriment to the consumer.

## ANALYSIS

### A. Indiana Deceptive Consumer Sales Act

The IDCSA prohibits the use of deceptive acts in connection with a "consumer transaction." Ind. Code § 24-5-0.5-3. The IDCSA is to "be liberally construed and applied to promote its purposes and policies." *Id.* § 24–5–0.5–1.

Indiana Code Section 24-5-0.5-3 concerns "deceptive acts." Subsection (a) provides:

> [a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

Ind. Code § 24-5-0.5-3(a) Subsection (b), "without limiting the scope of subsection (a)," sets forth thirty-seven "deceptive acts."

#### 1. *Statute of Limitations*

"Any action brought under [the IDCSA] may not be brought more than two (2) years after the occurrence of the deceptive act." Ind. Code § 24-5-0.5-5(b). Under the occurrence rule, the

IDCSA's two-year statute of limitations is "triggered by the date of each occurrence" of a deceptive act. *State v. Classic Pool & Patio, Inc.*, 777 N.E.2d 1162, 1166 (Ind. Ct. App. 2002).

Plaintiff filed its Complaint on August 14, 2019, which is significantly more than two years after the parties initially entered into a contract for natural gas. At this point in the proceedings, the Court does not delve into the distinctions between incurable deceptive acts and uncured deceptive acts as it relates to the statute of limitations. Given the breadth of the language in subsection (a) of Indiana Code Section 24-5-0.5-3, which includes "an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction" the Court finds that the Complaint alleges that Defendant engaged in such conduct within two years of the filing of the Complaint.

Plaintiff has alleged a "price gouging scheme" that continued from month to month, and that was deceptive based on statements that its pricing was based on market prices. Accordingly, the IDSCA claim will not be dismissed on grounds that it is untimely.

## 2. *Consumer Transaction*

Defendant argues that the IDCSA does not apply to Plaintiff Union's purchase of natural gas because it was not a consumer transaction as defined by the IDSCA. Defendant notes that the Complaint does not indicate the purpose for which Plaintiff purchased natural gas. It does not allege that the purchase was for personal, family, or household use, or for any other purpose recognized as a consumer transaction.

The Act defines a consumer transaction as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible, except securities and policies or contracts of insurance . . . with or without an extension of credit, to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or

6

a solicitation to supply any of these things." Ind. Code § 24-5-0.5-2(a)(1). "'Person' means an individual, corporation, the state of Indiana or its subdivisions or agencies, business trust, estate, trust, partnership, association, nonprofit corporation or organization, or cooperative or any other legal entity." *Id.* § 24-5-0.5-2(a)(2).

Indiana statutes must be construed by using the plain and ordinary meanings of terms, unless doing so would result in a construction that "is plainly repugnant to the intent of the legislature or of the context of the statute." Ind. Code § 1–1–4–1(1). It stands to reason that if Plaintiff, a corporation, is considered a "person" under the Act, it can make purchases of items and services that are primarily for that corporation's personal use. Here, the clear implication of the Complaint is that the purchase of natural gas was for that corporation's personal use. Plaintiff did not sell the natural gas to other consumers. Rather, it was using the natural gas as a source of energy like any other consumer would. Accordingly, the Court does not dismiss the IDSCA claim on grounds that it does not involve a consumer transaction.

### 3. *Reliance*

"A person relying upon an uncured or incurable deceptive act may bring an action" under the IDSCA. Ind. Code § 24-5-0.5-4. As a separate ground for dismissal, Defendant argues that the Complaint fails to allege that anyone acting on behalf of Plaintiff relied upon any statements in the contract in making the decision to purchase natural gas from Defendant instead of from its previous supplier.

The Court finds that the Complaint allegations sufficiently state that the "market price" language in the 2004 contract was a factor that induced Plaintiff to contract with Defendant to provide Plaintiff with natural gas. *See, e.g.*, Compl. ¶ 22 (alleging that Plaintiff "reasonably expected" that Defendant's variable rate plan for natural gas, "which would be based on market

7

prices" would "only vary from its initial rate based on 'market prices.'"). Additionally, Plaintiff refers to Defendant's conduct as classic "bait-and-switch." Plaintiff could not have been "baited" by something it did see or rely upon. *See, e.g.,* Compl. ¶ 19 (alleging that Defendant "lured customers into switching natural gas providers by offering an initial fixed rate for a limited period of time that is competitive with local utility natural gas supply rates" and then switches to "current 'market rates'" that "do not reflect changes in market prices for the natural gas"); ¶ 21 (alleging that Defendant's offer for an initial rate to be followed by a market-based variable rate was made "[t]o obtain [Plaintiff's] business"). Finally, Plaintiff alleges that during the period it could rescind the customer agreement, the contract served as a solicitation in which Defendant "identified the basis upon which the promised market-based variable rate would be determined." (Compl. ¶ 23.)

For purposes of pleading, Plaintiff has sufficiently provided the time, manner, and content of the purported misrepresentation that it relied upon. Whether Plaintiff will be able to prove such reliance is not a question to be answered at this stage of the litigation.

**B.     Breach of Contract**

*1.     Statute of Limitations*

Defendant argues that the statute of limitations began running in 2004, when it entered into a contract with Plaintiff or, at the latest, in 2006, when Plaintiff rolled from its expired fixed rate to the variable rate. In Indiana, "[a]n action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued." Ind. Code § 26-1-2-725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* § 725(2).

Plaintiff counters that each charge and payment constituted a separate breach of contract, and cites to *Marion County v. State*, 888 N.E.2d 292, 299 (Ind. Ct. App. 2008), a case applying

8

the continuing violation or continuing wrong doctrine. Indiana courts have applied the doctrine in two categories of cases:

> The first includes cases in which the original violation occurred outside the statute of limitations, but is closely related to other violations that are not time-barred. In such cases, recovery may be had for all violations, on the theory that they are part of one, continuing violation.
>
> The second type of continuing violation is one in which an initial violation, outside the statute of limitations, is repeated later; in this case, each violation begins the limitations period anew, and recovery may be had for at least those violations that occurred within the period of limitations.

*Marion Cnty.*, 888 N.E.2d at 299 (citations omitted). For the doctrine to apply, "the plaintiff must demonstrate that the alleged injury-producing conduct was of a continuous nature." *Yoost v. Zalcberg*, 925 N.E.2d 763, 771 (Ind. Ct. App. 2010) (quoting *Palmer v. Gorecki*, 844 N.E.2d 149, 156 (Ind. Ct. App. 2006)). Plaintiff argues that its breach of contract claim "may be based, at a minimum, on all charges and payments that occurred within four years of the filing of the complaint." (Pl.'s Mem. 7.)

The Court agrees that Plaintiff's allegations of breach appear to fall within the second type of continuing violation. Accordingly, the Court will not dismiss the breach of contract claim on statute of limitations grounds.

### 2. *Variable Rate Contract Language*

"To prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). Plaintiff contends that the following allegations are more than sufficient to allege a breach of contract. Defendant was contractually obligated to provide Plaintiff with natural gas and to charge rates "based on market prices." (Compl. ¶ 19.) "Market prices" refers to Defendant's costs to provide natural gas, as well as the

rates Defendant's competitors charge for retail natural gas. (*Id.* ¶ 22.) Defendant breached the contract by charging exorbitant rates that were not competitive or based on wholesale market prices. Historical tables of wholesale gas prices and the rates charged by NIPSCO (which are based on NIPSCO's actual costs) show there is no correlation between Defendant's rates and market prices. (*Id.* ¶¶ 25-30, 36-40.) Moreover, Defendant's rates were higher than those of 90% of other natural gas retailers. (*Id.* ¶ 71.)

Defendant argues that Plaintiff's breach of contract claim cannot proceed because the Complaint allegations show that Defendant's variable rate was in the range of market prices. Defendant asserts that the Seventh Circuit has already determined that wholesale and utility rates— the comparisons used in Plaintiff's Complaint—are not appropriate. Additionally, Plaintiff's own allegations show that Defendant's rates were lower than 10% of alternative gas suppliers' rates.

Defendant's position is premised on the Seventh Circuit's decision in *Sevugan v. Direct Energy Services, LLC*, 931 F.3d 610, 612 (7th Cir. 2019). In *Suvugan*, the plaintiff contracted with an alternative retail electric supplier, Direct Energy. He sued Direct Energy based on two clauses in his contract. One clause indicated that prices "are set competitively and are not regulated by the Commission." *Sevugan*, 931 F.3d at 612. The other clause, a renewal clause, stated that Direct Energy would charge the plaintiff "at a variable per kWh based upon generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion." *Id.* at 613. Sevugan asserted that Direct Energy's variable charges were not based on generally prevailing market prices, that it failed to provide a competitive rate, and that it increased its adder to an unreasonable level. *Id.*

Direct Energy moved to dismiss the complaint, and the district court granted the motion. The court concluded that Sevugan did not allege facts showing Direct Energy's rates were not

10

"based on generally prevailing market prices" because Plaintiff pled only the prices of the utility, ComEd, and of the PJM market. *Id.* The complaint was silent on rates the court considered to be Direct Energy's competition—other Illinois alternative retail energy suppliers. *Id.* at 613–14. The court further ruled that breach of contract had not been alleged because the contract did not promise to charge rates lower than ComEd's. *Id.* at 614. The court also found Sevugan's pleading deficient as it related to the "adder" and to the competitiveness of its rates. *Id.*

Sevugan appealed. The court of appeals found it problematic that Sevugan interpreted "generally prevailing market price" to mean that Direct Energy was required to set its variable rates lower than the wholesale rate and the regulated rate. *Id.* at 615. However, Sevugan's complaint "lack[ed] a critical feature of comparison: it d[id] not contain a valid comparator against which to measure 'generally prevailing market prices.'" *Id.* The court held that wholesale prices were not a sound comparison because it "is the price to energy companies, not the consumer." *Id.* (noting that individual customers like Sevugan could not go out and purchase electricity at the PJM wholesale rate, regardless of who supplied them with electricity). Likewise, the rates charged by the regulated utility was not a proper comparison because the point of deregulation was to permit the market, not state regulators, to determine rates. *Id.* at 615–16. Neither of Sevugan's comparators participated in the general market for electricity, and thus they could not be a "gauge [of] market price." *Id.* at 616.

The court concluded that the valid comparators to determine whether Direct Energy had breached its contract were other alternative retail energy suppliers in the state. *Id.* Sevugan's only allegation regarding those entities was a conclusory claim that Direct Energy's prices were substantially higher than other alternative retail energy suppliers. *Id.*

> At bottom, Sevugan's claim that Direct Energy did not charge rates commensurate with [the utility company's], or with the wholesale price . . . , fails to allege a breach.

11

> The parties' contract does not require Direct Energy to charge such rates. Without any information about valid market comparators, such as other alternative retail energy suppliers, Sevugan's breach of contract claim is speculative and implausible.

*Id.* at 616–17.

*Sevugan*, on its face, is problematic for Plaintiff, who relies on the same kind of comparators that the Seventh Circuit said were not valid for purposes of determining market price. According to Plaintiff, "[j]udicial opinions denying contract claims against deregulated energy suppliers like Defendant are legion, particularly where the plaintiff alleges that the defendant promised to charge market-based prices, but charged rates substantially higher than local utilities and the defendant's rates did not fluctuate with wholesale market changes." (Pl.'s Mem. 9.) That may be, but the district court cases Plaintiff cites are not controlling on this Court. It is the *Sevugan* opinion that must be distinguished in some meaningful manner. The Court now turns to those arguments.

Plaintiff first notes that *Sevugan* involved a contract in which the energy supplier had significant discretion to set prices independent of market costs. The Court agrees that a contractual term providing for such discretion is a material difference. Suvugan's contract allowed Direct Energy to use an adder, determined solely by Direct Energy in its discretion. The language at issue here does not confer any such broad discretion on Defendant. This lack of language connecting rate changes to Defendant's discretion is compounded by the fact that neither did the contract permit Defendant to base its price on anything other than market prices. Market price was offered as the sole determination of how the variable rate would be determined. The contract specified no other non-market factors or inputs.

"The goal of contract interpretation is to determine the intent of the parties when they made the agreement." *Celadon Trucking Servs., Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017)

(quoting *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014)). But here, the phrase "based on market prices" is an ambiguous term because "reasonable people could differ as to its meaning." *Id.* (quoting *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016)). One interpretation is that it encompasses something close to procurement costs, plus a commercially reasonable profit margin. Another interpretation is that market prices are the prevailing market rates charged by other ANGS. Although the phrase arguably does not require Defendant to charge rates commensurate with the local utility or with the wholesale market price, it is plausible that an agreement for a variable rate plan based on market prices means there would be some fluctuation in price tethered to wholesale prices. If not, it is entirely unclear what market price is a reference to.

Importantly, Plaintiff is not asserting that the contract required Defendant's variable rate to be less than NIPSCO's rate, or even some percentage of NIPSCO's rate. Its claim is that Defendant could not have determined its rates based on market prices when its rates are, on average, 585.9% higher than NIPSCO's and do not fluctuate in a manner consistent with fluctuations in the wholesale market, one of the main considerations in the market.

Plaintiff has alleged that a reasonable customer would expect market prices to reflect wholesale prices and competitors' rates, and that Defendant's rates do not satisfy this condition. Given the ambiguity of the lone phrase "based on market prices," Plaintiff has set forth a plausible allegation of breach of contract. Encompassed within the breach of contract claim is the concept of an implied covenant of good faith and fair dealing. "Every contract or duty within IC 26-1 imposes an obligation of good faith in its performance or enforcement." Ind. Code § 26-1-1-203. While this does not mean there is an independent cause of action for failure to perform in good faith, s*ee id.*, cmt, an implied covenant of good faith and fair dealing is imposed when a contract

13

is ambiguous. *Old Nat'l Bank v .Kelly*, 31 N.E.3d 522, 531 (Ind. Ct. App. 2015); *Gerdon Auto Sales, Inc. v. John Jones Chrysler Dodge Jeep Ram*, 98 N.E.3d 73, 82 (Ind. Ct. App. 2018). "It is only where the intentions of the parties cannot be readily ascertained because of ambiguity or inconsistency in the terms of a contract or in relation to extrinsic evidence that a court may have to presume the parties were acting reasonably and in good faith in entering into the contract." *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 604 (Ind. 1990). ("[T]he court may be required to presume the parties were acting reasonably and in good faith to discern the intention of the parties and resolve the ambiguity or uncertainty."). Additionally, when there is ambiguity in a contract, it is construed against the party that furnished and drafted it. *MPACT Const. Grp., LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 910 (Ind. 2004).

The ambiguity of the contractual language, combined with the absence of any language granting Defendant price-setting discretion or indicating that non-market factors might impact pricing, as well as the significant rate differential over the local utility rate, lead the Court to conclude that *Sevugan* does not require dismissal of the Complaint for failure to plausibly assert a breach of contract claim.[2]

## CONCLUSION

For the reasons stated above, the Court DENIES the Motion to Dismiss [ECF No. 5] filed by Defendant Spark Energy, LLC.

SO ORDERED on February 18, 2020.

                                      s/ *Holly A. Brady*
                                      JUDGE HOLLY A. BRADY
                                      UNITED STATES DISTRICT COURT

---

[2] As Plaintiff's claim of unjust enrichment was pled in the alternative to its claim for breach of contract, the Court need not address it now.